*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* C. K. ANDERSON, Minor.

UNPUBLISHED
June 17, 2026
2:22 PM

Nos. 376001; 376002
Wayne Circuit Court
Family Division
LC No. 2023-000207-NA

Before: GADOLA, C.J., and RIORDAN and LETICA, JJ.

PER CURIAM.

In Docket No. 376001, respondent-mother appeals as of right the trial court's order establishing a guardianship for her adopted daughter, CKA, with the child's biological maternal grandmother. In Docket No. 376002, respondent-father, CKA's biological father, appeals as of right the same order. We affirm.

## I. FACTS

CKA's biological mother passed away when CKA was an infant. Respondents thereafter married and respondent-mother adopted CKA. Respondent-mother has one son from a previous relationship, and respondents had one son in common at the initiation of this case. Respondents have a history of domestic violence and were investigated by Children's Protective Services (CPS) several times before this case was initiated. In 2016, CPS substantiated a report of improper supervision of CKA after she was injured during domestic violence between respondents.

Respondents divorced in Kansas in 2019. Respondent-father testified that he was awarded physical custody of CKA and respondent-mother was awarded physical custody of the child born during their marriage. The record suggests that at the time respondents divorced they planned that CKA would be adopted by her paternal grandparents, but the adoption did not take place. After respondents divorced, they continued to share a "main home," though respondent-father also maintained an apartment. While the proceedings in this case were ongoing, respondents had two more sons together.

-1-

In December 2022, respondent-mother advised CPS that CKA had "self-inflicted" injuries. In January 2023, when CKA was nine years old, respondent-mother reported to CPS that CKA had run away from respondents' home. The CPS worker advised respondents to contact law enforcement and to seek a psychological evaluation for the child, which led to CKA's being admitted to the University of Michigan's C.S. Mott Children's Hospital's emergency department. Respondents informed hospital staff that CKA has Oppositional Defiant Disorder (ODD) and had been displaying self-injurious behavior (SIB). However, medical personnel evaluating CKA reported that the child did not display any behavior that would indicate ODD nor did the child display any other behavioral disorder such as self-injurious behaviors.

Hospital staff observed bruising on CKA's body and concluded that her injuries were not self-inflicted but rather were the result of physical abuse. CKA reported that respondent-father hit her with a hockey stick, and that respondent-mother hit her in the face and head and that she had ongoing headaches as a result. She reported that she often was forced to exercise in the garage at night instead of sleeping and was punished if she fell asleep. CKA also reported that her brothers were allowed to hit her and were encouraged to be cruel to her. CKA reported that respondent-mother threatened that if CKA disclosed the abuse, she ultimately would be returned home where she would be punished.

CKA also was diagnosed with severe nutritional deficiency including iron deficiency anemia requiring a blood transfusion. CKA reported that respondent-mother provided her with less food than she provided to CKA's siblings and often was given only the table scraps after her brothers had eaten. Respondents contacted the hospital and requested that CKA's food intake be limited and that CKA be on a restricted menu, even after hospital staff expressed their concerns regarding CKA's poor nutrition. Hospital staff reported that respondent-father called CKA "fat," and also resisted authorizing Tylenol for CKA because he claimed CKA was "manipulating and lying about her pain."

CPS worker LaToya Boyles testified that for a time, CKA had lived with respondent-mother at the paternal grandmother's home. Boyles testified that there were ongoing proceedings regarding allegations that respondent-father's brother physically and sexually abused CKA while CKA was living with the paternal grandmother.

CKA and her siblings were removed from respondents' home in February 2023 and CKA was placed with her biological maternal grandmother. Respondents admitted to engaging in domestic violence when the children were present, and the trial court assumed jurisdiction of the children under MCL 712A.2(b)(1) and (2). A treatment plan was adopted, which included respondents participating in Families First; petitioner also provided community resources to respondents, provided family team meetings, and provided counseling to CKA. The treatment plan required respondents to attend all hearings and all medical appointments, and to participate in all scheduled parenting classes, therapy, counseling, and all scheduled domestic violence and anger management classes. Respondents also were required to maintain suitable housing and a legal source of income.

In light of the allegations of abuse, the trial court suspended respondents' parenting time with CKA pending a therapist's determination that parenting time would be appropriate. After an unproductive family therapy session was attempted, CKA's therapist did not recommend further

family therapy. Respondent-father repeatedly demanded family therapy with CKA and parenting time, but the trial court deferred to the therapist's recommendation against family therapy sessions. CKA consistently refused to speak with respondents or her siblings and declined contact with them throughout the proceedings, and the trial court therefore did not order parenting time. CKA was thriving in her placement with her maternal grandmother; she excelled at school and reported being very happy living with her grandmother. The grandmother reported that CKA was a bright, kind, and compassionate child who willingly obeyed rules, helped with chores, and exhibited no defiant behavior. The grandmother explained that when CKA first came to live with her, CKA was fearful and timid and ate and slept a great deal, but that those behaviors had diminished as the child became more comfortable.

The psychologist evaluating CKA reported that CKA was observably bright and happy; CKA and her grandmother interacted with each other with affection and appeared well bonded. CKA reported that while in respondents' care, she was subject to physical abuse, emotional abuse, threats, and had food withheld as punishment. CKA also reported observing domestic violence between respondents. CKA reported that her father often beat respondent-mother and that respondent-mother in turn was abusive to her. CKA reported that respondent-mother told her if respondent-father treated her (respondent-mother) better, then she would begin treating CKA better. According to the psychologist's report, respondent-mother reported domestic violence by respondent-father. Respondent-father reported that respondent-mother had a "vendetta" against CKA and had "mistreated" CKA; in 2022, respondent-father reported to CPS various incidents of physical and emotional abuse that respondent-mother perpetrated upon CKA.

Respondents completed elements of their service plans[1] and eventually regained custody of CKA's siblings in January 2025. However, respondents continued to engage in incidents of domestic violence in the presence of the children. At the permanency planning hearing held February 25, 2025, foster care case worker Harris testified that respondent-father no longer was in compliance with his case service plan.

The foster care case worker also testified that there had been no progress by respondents with regard to CKA; despite medical reports that CKA suffered physical abuse and starvation while in respondents' care, and despite respondent-father disclosing respondent-mother's abuse of CKA to the evaluating psychologist, respondents continued to assert that CKA did not suffer abuse while in their care and that CKA lied about the abuse. CKA consistently asserted that she did not want contact with respondents or with her siblings. The foster care case worker testified that a guardianship was a desirable outcome for CKA in light of respondents' failure to progress toward reunification with CKA.

---

[1] At the June 13, 2024 dispositional review hearing, respondent-mother testified that as of April 23, 2024, she had not completed any of the services required by the parent agency treatment plan and had been charged in connection with a March 29, 2024 domestic violence incident with respondent-father. The treatment plan was extended to enable respondent-mother to continue with services.

In April 2025, the trial court placed CKA in a guardianship with her biological maternal grandmother. In its order, the trial court stated, in relevant part:

> [The] Court finds that father has not complied with treatment plans for at least 15 months. No progress has been made toward reunification. . . .

> Adoptive mother [] only requests contact/visits with [CKA]'s siblings. [Adoptive mother] has no desire for [CKA] to be placed with her.

The trial court also found that the agency made reasonable efforts towards reunification. Respondents each appealed the trial court's order, and this Court consolidated respondents' appeals. *In re CK Anderson Minor*, unpublished order of the Court of Appeals, entered June 18, 2025 (Docket Nos. 376001 & 376002).

## II. DISCUSSION

## A. REASONABLE EFFORTS

Respondents challenge the trial court's order appointing a guardian for CKA. Respondents argue that the trial court clearly erred by determining that petitioner, the Michigan Department of Health and Human Resources (DHHS), made reasonable efforts toward their reunification with CKA under MCL 712A.18f. We conclude that the trial court did not err in its determination that petitioner made reasonable efforts toward reunification.

When reviewing a trial court's decision establishing a juvenile guardianship, we review the trial court's factual findings for clear error and review the trial court's decision to appoint a guardian for an abuse of discretion. *In re Burns*, ___ Mich App ___; ___ NW3d ___ (2025) (Docket No. 373903); slip op at 3. We review for clear error the trial court's finding that the petitioner made reasonable efforts toward reunification. *In re Atchley*, 341 Mich App 332, 338; 990 NW2d 685 (2022). A finding is clearly erroneous if this Court has a definite and firm conviction that a mistake has been made, *id.*, giving regard to the trial court's opportunity to observe the witnesses, *In re Burns*, ___ Mich App at ___; slip op at 3. The trial court abuses its discretion when it chooses a result outside the range of principled outcomes. *In re DMAN, Minor*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket Nos. 364518, 364520); slip op at 2.

Reasonable efforts to reunify a child with his or her parents after the child has been removed from the parents' care must be made in all cases except those cases involving aggravated circumstances. *In re Rippy*, 330 Mich App 350, 358-359; 948 NW2d 131 (2019), citing MCL 712A.19a(2); see also *In re Hicks*, 500 Mich 79, 85; 893 NW2d 637 (2017). Reasonable efforts include creating a service plan "outlining the steps that both [the agency] and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *Id.* at 85-86. The service plan must include a schedule for regular and frequent parenting time "unless parenting time, even if supervised, would be harmful to the child as determined by the court under section 13a of this chapter or otherwise." MCL 712A.18f(3)(e). MCL 712A.13a(13) states:

> If a juvenile is removed from the parent's custody at any time, the court shall permit the juvenile's parent to have regular and frequent parenting time with the juvenile. Parenting time between the juvenile and his or her parent must not be less than 1

time every 7 days unless the court determines either that exigent circumstances require less frequent parenting time or that parenting time, even if supervised, may be harmful to the juvenile's life, physical health, or mental well-being. If the court determines that parenting time, even if supervised, may be harmful to the juvenile's life, physical health, or mental well-being, the court may suspend parenting time until the risk of harm no longer exists. The court may order the juvenile to have a psychological evaluation or counseling or both, to determine the appropriateness and the conditions of parenting time.

Although the petitioner has a responsibility "to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered." *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). Not only must a respondent-parent participate in services, but he or she also must "demonstrate that they sufficiently benefited from the services provided." *Id*.

When aggravated circumstances exist, however, the trial court may terminate parental rights[2] without DHHS making reasonable efforts toward reunification. MCL 712A.19a(2)(a) provides that reasonable reunification efforts are not required if "[t]here is a judicial determination that the parent has subjected the child to aggravated circumstances as provided in section 18(1) and (2) of the child protection law, 1975 PA 238, MCL 722.638." See also *In re Rippy*, 330 Mich App at 358-359. The aggravated circumstances described in MCL 722.638(1) are, in relevant part:

(a) The department determines that a parent, guardian, or custodian, or a person who is 18 years of age or older and who resides for any length of time in the child's home, has abused the child or a sibling of the child and the abuse included 1 or more of the following:

* * *

(*iii*) Battering, torture, or other severe physical abuse.

* * *

(*v*) Life threatening injury.

In this case, the record supports a finding of aggravated circumstances. When CKA was hospitalized in January 2023 at the age of nine, she was bruised and her arms were swollen. Medical personnel examining the child concluded that the injuries arose from abuse and were not self-inflicted as reported by respondents. CKA reported that respondent-father had hit her arms

---

[2] We observe that the trial court in this case did not terminate respondents' parental rights to CKA. The trial court appointed the child's biological maternal grandmother as her guardian. The appointment of a guardian is an effort to avoid termination of parental rights. *In re TK*, 306 Mich App 698, 705; 859 NW2d 208 (2014). A juvenile guardianship in this context does not permanently separate a parent and child as it is reviewed annually, or more often if necessary, and may be revoked. *Id*.

with a hockey stick and respondent-mother had hit her buttocks with a baseball bat. She further reported that respondent-mother frequently hit her in the head and face which caused her to have ongoing headaches. Respondents allowed her brothers to hit her and throw things at her. CKA was so severely malnourished that she required a blood transfusion; nonetheless, respondents sought to have the hospital restrict CKA's food. CKA reported that she was given very little food at home, that she was forced to eat in the garage and was given only the scraps from her brothers' plates. At night, she was forced to exercise in the garage instead of sleeping and was punished if she fell asleep. The record firmly supports a finding that CKA was subjected to battering, torture, and other severe physical abuse, and respondents' starving of CKA resulted in malnutrition so severe as to be life-threating. Although the trial court did not make a finding of aggravated circumstances, the record supports such a finding.

We observe, however, that petitioner in this case made reasonable efforts toward reunification of respondents with CKA. A treatment plan was adopted that included respondents participating in Families First, and provided respondents with community resources, family team meetings, parenting classes, therapy, counseling, domestic violence and anger management classes, and counseling for CKA. Although respondents participated in many of the services, the trial court found that respondent-father eventually stopped participating in the services. Unfortunately, respondents did not benefit from those services; respondents continued to engage in domestic violence despite counseling and education intended to stop that behavior. Most important, respondents refused to accept responsibility for the serious injuries they inflicted upon CKA. Despite all evidence to the contrary, including respondent-father's own statements to the evaluating psychologist that respondent-mother was abusing CKA, respondents persisted in the fiction that CKA inflicted her own injuries and was lying about the abuse. Thus, despite the reasonable efforts made by petitioner, respondents failed to benefit from the services offered.

We also reject respondents' assertion that that the trial court permitted CKA independently to decide to restrict parenting time and family therapy. A trial court is not required to permit parenting time if it would be harmful to the child's mental well-being. MCL 712A.13(a)(13). Here, the record suggests that parenting time or family therapy would have been damaging to CKA's mental health. A review of the record indicates that the trial court suspended respondents' parenting time with CKA and family therapy based on the recommendations of the child's therapists. Medical personnel at the hospital reported that CKA had been physically and psychologically abused by respondents. An independent psychological evaluation indicated similar findings. The attempted family therapy session was unproductive. Foster care worker Tina Harris opined that family therapy would likely never be recommended when, as here, the child was refusing contact with the parents and siblings.

The trial court indicated that its decision not to order contact between CKA and respondents was in recognition that "without that interaction, [CKA] is really, really thriving." The trial court reasonably determined that family therapy and parenting time would be harmful to the child's mental well-being and was not required under the circumstances. See MCL 712A.13a(13). Moreover, respondents' argument demonstrates that respondents continue to ignore their abuse of CKA, which underscores respondents' failure to benefit from the services

provided.[3]  See *In re Frey*, 297 Mich App at 248.  We conclude that the trial court did not improperly decline to order family therapy and parenting time between respondents and CKA.

To summarize, despite evidence supporting a finding of aggravated circumstances, petitioner made reasonable efforts toward reunification of CKA with respondents.  Respondents, however, failed to benefit from the services provided and continued to deny any responsibility for the abuse they perpetrated upon CKA, which presented a significant barrier to reunification.  The trial court did not clearly err when it found reasonable efforts had been made in this case.

## B.  BEST INTERESTS

Respondents contend that the trial court abused its discretion by determining that guardianship with her biological maternal grandmother is in CKA's best interests.  We disagree.  We review for clear error a trial court's decision regarding a child's best interests, *In re Sanborn*, 337 Mich App 252, 276; 976 NW2d 44 (2021), focusing on the child rather than the parent, *In re Atchley*, 341 Mich App at 346.

"MCL 712A.19a establishes the process for appointing a guardian *before* termination of parental rights."  *In re COH*, 495 Mich 184, 197; 848 NW2d 107 (2014).  MCL 712A.19a(9)(c) states:

> (9) If the agency demonstrates under subsection (8) that initiating termination of parental rights to the child is clearly not in the child's best interests, or the court does not order the agency to initiate termination of parental rights to the child under subsection (8), the court shall order 1 or more of the following alternative placement plans:
>
> * * *
>
> (c) Subject to subsection (11), if the court determines that it is in the child's best interests, appoint a guardian for the child, which guardianship may continue until the child is emancipated.

When determining whether the appointment of a guardian is in a child's best interests, "the court may consider the best-interest factors from the Child Custody Act, [MCL 722.21 *et seq*.], the Adoption Code [MCL 710.21 *et seq*.], or any other factors that may be relevant under the circumstances of a particular case."  *In re COH*, 495 Mich at 208.  MCL 722.23 sets forth the factors for determining the best interests of the child, with the factors most relevant here being:

---

[3] We also note that respondent-mother, CKA's adoptive mother, is now divorced from respondent-father and does not appear to have engaged with the particular elements of the service plan related to CKA.  The trial court's order indicates respondent-mother "only requests contact/visits with [CKA's] siblings.  [Respondent-mother] has no desire for [CKA] to be placed with her."

(a) The love, affection, and other emotional ties existing between the parties involved and the child.

(b) The capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any.

(c) The capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs.

(d) The length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.

* * *

(h) The home, school, and community record of the child.

(i) The reasonable preference of the child, if the court considers the child to be of sufficient age to express preference.

(j) The willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents. . . .

(k) Domestic violence, regardless of whether the violence was directed against or witnessed by the child. [MCL 722.23.]

Here, respondents argue that the trial court did not state its factual findings on the record. The trial court, however, stated that guardianship is "in the best interests for [CKA] for stability at this point, guidance, and also it will help with her schooling." While the court's explanation lacks detail, ample support for this finding can be found in the record. CKA had been in the care of her biological maternal grandmother for two years at the time the guardianship was established. Since being placed with her grandmother, CKA had excelled at school, was enrolled in honors classes, and was participating in sports. The trial court commented that CKA was "the happiest juvenile" that had attended a hearing that week, and that CKA was thriving in the stable, supportive environment of her maternal grandmother's home, supporting the decision to extend the continuity of the placement. See MCL 722.23(d) and (h). These factors support that the guardianship is in CKA's best interests.

Respondents admitted they engaged in domestic violence in front of their children, including CKA, at the adjudication. They continued to engage in domestic violence despite relevant services being included in their plans. Respondents' failure to benefit from domestic violence services supports that the guardianship is in CKA's best interests. See MCL 722.23(k). Further, when the general preference for keeping siblings together is contrary to the best interests of the individual child, the best interests of the individual child prevails. *In re Olive/Metts Minors*, 297 Mich App 35, 42; 823 NW2d 144 (2012). Here, CKA reported that respondents permitted her brothers to hit her and encouraged them to treat her with cruelty. As a result, CKA did not wish

to visit with them during the proceedings, and the trial court observed that CKA was "really, really thriving" without the interaction. The trial court thus correctly concluded that it is in CKA's best interests to maintain distance from her siblings, which the guardianship will permit her to do.

Respondents and CKA are not bonded. Respondents were physically and emotionally abusive to CKA. CKA consistently asserted that she did not wish to have any contact with respondents, and respondent-mother did not express a desire to reunify with CKA. With respect to respondent-father, he allegedly hit CKA with a hockey stick, participated in starving CKA, insists that CKA lied about the abuse, and insisted that CKA has behavioral problems despite all evidence to the contrary. Respondent-father demonstrated his inability to provide the child with "love, affection, and guidance," as well as food and medical care. See MCL 722.23(b) and (c). These factors support a finding that the guardianship is in CKA's best interests.

By contrast, CKA was observed to be well bonded with her biological maternal grandmother; both CKA and the grandmother requested the guardianship. See MCL 722.23(a), (b), and (i). The grandmother's capacity and inclination to provide necessary material and emotional support for CKA had been tested for two years and had proven effective. We conclude that the trial court did not clearly err by finding that the guardianship was in CKA's best interests and it did not abuse its discretion by establishing the guardianship.

Affirmed.

/s/ Michael F. Gadola
/s/ Michael J. Riordan
/s/ Anica Letica